date rec'd 5/13/19 AF
ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
RUSSELL BOWENS,



                Plaintiff,      AMENDED COMPLAINT
                                    Index No. 19 CV 1523 (PKC) (CLP)

                                         JURY TRIAL DEMANDED

   -against-

The Correctional Association of New York,
SOFFIYAH ELIJAH, Former Executive Director
Of the Correctional Association of New York,

                Defendants.
-------------------------------------------------------x

## COMPLAINT

Plaintiff Russell Bowens, Pro Se, for his complaint against defendants The Correctional Association of New York, et al, allege as follows:

### JURIISDICTION AND VENUE

1. This court has jurisdiction over this action under 42 U.S.C. Section 1983 to remedy the deprivation under color of state law of rights guaranteed by the Whistleblower Protection Act/Civil Service Reform Act, 5 U.S.C. Section 2302 (b)(8), (b)(9); 42 U.S.C. Section 1983 Title VII, the ADA, the ADEA, FCA, and any and all rights afforded employees to prohibit retaliation guaranteed by the First Amendment of the United States Constitution. This court has jurisdiction over this action pursuant to 28 U.S.C. 1331.

2. This cause of action arose in the Eastern District of New York therefore venue is proper under 28 U.S.C. Section 1391 (b).

3. Plaintiff Russell Bowens also known to the Correctional Association (hereinafter C.A.) of New York as Nurideen Khalil Islam was at the time of these events relevant hereto, an employee at the C. A. located at 2090 ADAM CLAYTON POWELL BLVD. Jr., SUITE 200, New York, NY 10027, now located at 2632 Atlantic Avenue, Brooklyn, New York 11207-2425.

4. Defendant Soffiyah Elijah, former executive director was at all times relevant herein employed by the C.A. as the Executive Director (hereinafter E.D.) during plaintiff's tenure at the C.A. Upon information and beliefs, Defendant Elijah was hired in March of, 2011, until she was canned in 2018.

5. Defendant the Correctional Associational of New York was at all times relevant herein the employer of plaintiff. The organization has been in existence since 1844. Upon information and beliefs, the C.A. operated at or near a three million dollar annual budget during plaintiff's tenure at the C.A. The lion's share of the payroll went toward a handful of employees. There was a culture of the "haves and have-nots" within the organization. Plaintiff was clearly one of the have-nots.

6. At all relevant times herein, defendants were "persons" for purposes of 42 U.S.C. Sections 1983, and acted under color of law to deprive plaintiff of his constitutional rights as set forth more fully below.

## STATEMENT OF FACTS

7. On or about April 3, 2012 plaintiff was temporarily hired by the C.A. to work in the Prison Visiting Project Department (hereinafter P.V.P.) to help with data entry. His position was supposed to last between 60 to 90 days.

8. Plaintiff was not given benefits or a salary for his temporary position. He was paid $20.00 hourly and worked 20 hours a week.

9. On or about July 1, 2012 plaintiff's temporary status at the C.A. was extended. He received the same pay wages without benefits.

10. On or about July 1, 2013, plaintiff's temporary status was removed and plaintiff became an acknowledged employee of the C.A. He was hired part-time, and his hourly pay was $20.00 without benefits. All employees received a pay increase, and plaintiff's hourly wages increased to $20.61.

11. On or about July 1, 2013, Defendant Elijah (Former E.D.) met with plaintiff in her office and asked plaintiff not to leave the organization. She promised to secure more hours and health benefits for plaintiff. Nearly two years lapsed and Defendant Elijah's (former executive of C.A.N.Y.) promises never materialized.

12. Plaintiff witnessed at least 8 employees get hired full-time with benefits. Some employees were shuffled around within the organization. Plaintiff often voiced his objection at the staff meetings that he was being taken advantage of and treated like an undocumented worker.

13. On or about September of 2013, Defendant Elijah (Former E.D.) suggested to Judy Yu, (Former Associate Director of the Lesbian, Gay, Bisexual, Transgender and Queer) (hereinafter LGBTQ) Issues at the C.A. to ask plaintiff to accompany her on a series of trips to the Office of Children and Family Services (hereinafter O.C.F.S.) facilities to assist her with gathering important data concerning how well the LGBTQ's policy is being adhered to at the O.C.F.S. facilities.

14. Judy Yu informed plaintiff that Defendant Elijah (E.D.) suggested that he accompany her on the O.C.F.S. facilities visits. She also informed plaintiff that he would have to be trained and cleared to go into the facilities, and that he would be away from home several days during the trips.

15. Truth being stranger than fiction, Ms. Yu informed plaintiff that he would receive a $50.00 stipend daily in lieu of his regular wages. Plaintiff was asked to work longer hours, and receive significantly less pay. Plaintiff was drafted the poster child for the adage "no good deed goes unpunished," plaintiff digested what the defendants were asking of him as being preposterous, and void of twenty-first century logic. Plaintiff capitulated, but took his grievances to his supervisor and other superiors within the organization.

16. Plaintiff addressed his concerns to several of his co-workers including his immediate Supervisor Jack Beck, and the Chief Financial Officer Gordon Miller (hereinafter C.F.O.). They conceded that plaintiff should be paid his regular wages like all employees that goes on O.F.C.S. visits or any work related assignments.

17. Upon information and belief, Jack Beck (Plaintiff's Supervisor) and Gordon Miller (C.F.O.) spoke with Defendant Elijah (E.D.) about plaintiff's concerns. Defendant Elijah (E.D.) Shrugged plaintiff's concerns off.

18. Upon information and belief, Gordon Miller (C.F.O.) also spoke with Laura Davidson, Director of Operations and Human Resources (hereinafter D.O.O. and H.R.) about the disparity in pay that plaintiff would receive. Ms. Davidson (D.O.O. and H.R.) told Gordon Miller (C.F.O.) that it was the organization's policy to give part-time workers a $50.00 stipend for a full-day's work in lieu of their regular wages.

19. When Gordon Miller (C.F.O.) asked Ms. Davidson (D.O.O. and H.R.) to see a copy of the policy she stated "it wasn't in writing; it's the C.A.'s practice." Plaintiff found their undocumented policy to be borderline absurd. The fact that they actually enforced it crossed the border.

20. The defendants didn't have the slightest qualms about paying plaintiff substantially below minimum wages. An undocumented worker would have received more equitable earnings. Defendant Elijah and Laura Davidson (D.O.O. and H.R.) could not conceptualize that a mere $50.00 dollar in stipend for a full days ways work was unfair, and that they were abusing plaintiff because he was formerly incarcerated.

21. Plaintiff, though aggrieved, by the blatant discrimination and exploitation of his part-time status-felt pressured by the Executive Director to go on the work related assignments to the O.C.F.S. facilities. Defendant Elijah imposed her will on by reminding him that she was the executive director and that plaintiff worked for her. Plaintiff capitulated and caved into her demands.

22. Plaintiff was further degraded, and blindsided during one of the trips to the O.C.F.S. facilities when one of his co-workers informed him that they all were performing the same tasks, but plaintiff was the employee subjected to a drastic pay cut based solely on his part-time status at the organization.

23. Gordon Miller, Gabrielle Prisco and Angelo Pinto were employed at the C.A. they accompanied plaintiff and Judy Yu on at least one of these work related trips. They received their regular salaries. Serval volunteers also accompanied the C.A. on the trips to the O.F.C.S. facilities.

24. Upon information and beliefs, the volunteers were given a $50.00 stipend each day for their services or their place of employment paid them their regular salaries. Plaintiff was given the same $50.00 stipend as some or all the volunteers.

25. Plaintiff was effectively demoted from an employee to volunteer status during the O.F.C.S. facilities visits. The defendants circumvented paying plaintiff like his similar situated co-workers performing substantially the same work related task. Defendants' collusion continued for years.

26. Plaintiff was never issued an employee manual. A plausible employee manual would have protected plaintiff's rights against the defendants' discrimination. The employee manual should have spelled out in black and white that part-time employees "shall" be issued a $50.00 stipend each day in lieu of their regular wages, even if part-time workers perform the same job related assignments as full-time employees.

27. On or about June 1, 2014 plaintiff was one of several employees at the C.A. slated to attend the 5 days conference held by the International Committee of the Red Cross at John Hopkins Bloomberg School of Public Health in Baltimore, Maryland.

28. Plaintiff's co-workers could not commit to the full week conference. They were scratched from the trip. Plaintiff embarked on the endeavor alone.

29. On or about June 21, 2014, Plaintiff arrived in Baltimore for the week long work related conference. Plaintiff spent a total of 6 days on the work related visit. He attended the workshop from 9:00 a.m. to 5:00 p.m. each day. Sunday was his travel day.

30. When Plaintiff returned from his work related assignments in Baltimore, he was flabbergasted to learn that he would only be paid for two and a half days of work instead of the entire week that he attended the conference on the C.A's. behalf.

31. True to form, and in sync with the defendants' standard method of operating, plaintiff was told by the defendants that he would only be paid for two and a half days despite the fact that plaintiff was on work details for five days, plus one travel day. Plaintiff was outraged and in utter disbelief. Plaintiff expressed his dissatisfaction every chance he got at staff meetings.

32. On or about July or August, 2014, at the next staff meeting plaintiff reported back on his learnings and teachings during the work related conference he attended in Baltimore, Maryland on the behalf of C.A.N.Y.

33. Plaintiff keyed in on the topic of "Death of Detainees held in detention." It was a major topic at the International Red Cross Convention in Baltimore, Maryland, and a topic whose time has come at the C.A.N.Y. Shortly before plaintiff went on his trip to International Red Cross Convention, he was informed that a detainee had died in the very holding pens that C.A.N.Y had recently monitored seven (7) months earlier. To make matters worse, the detainee died within walking distance from many of C.A.N.Y. staff members lived including Defendant Soffiyah Elijah (Former E.D.).

34. The report and recommendation was never submitted prior to the deceased death, because Defendant Elijah (E.D.) objected to writing a scattering report about the applauding conditions of the Brooklyn Court Bull Pens. Despite the fact that it was the opinion of the monitoring team, and the lead monitor Mujahid Farid (recently deceased), and hired by Defendant Elijah (E.D.), to do the monitoring. (See exhibit: 1). The defendant(s) failure to submit the report, may have caused Kayam Livingston's death.

35. When plaintiff discovered that a detainee, 37-years-old Kayam Livingston, had died (been murdered) in the Brooklyn Court Bull Pens, he called his co-workers out on the carpet at the staff meeting for turning a blind eye to the incident. Many of plaintiff's co-workers stated that they weren't aware of the incident. (See exhibit: 2).

36. Upon information and beliefs, even after the deceased family's attorney subpoenaed the C.A. for all relevant documents relating to the Brooklyn's Court Bull Pens monitoring, Defendant Elijah (E.D.) deliberately and inexplicably failed to turn over important papers and documents to the victim's family attorney. Instead, Defendant Elijah (E.D.) placed a gag order on staff and instructed Muhahid Farid (recently deceased), and Tyrrell Muhammad that if anyone called about the incident, they are to have no comments.

37. On or about October 27, 2014, Plaintiff was informed that another detainee had died in a Holding Bull Pens in the County of Kings. 22-year-old Jasmine Lawrence, died in the 79th Precinct Holding Bull Pens. (See exhibit: 3).

38. Defendant Elijah was not directly involved in the Jasmine Lawrence incident. However, indirectly, the report she failed to submit could have lead to sweeping changes for the entire County of Kings Holding Pens. Ms. Lawrence may have very well been the recipient of "change" and it may have saved her life as well. (See exhibit: 1).

39. During the C.A.'s last retreat at Castles Garden in 2015, plaintiff again voiced his frustrations with the way the organization had discriminated against him. Plaintiff reminded staff that he has bills to pay too, and that he has been discriminated against because of his part-time employee status.

40. Plaintiff confronted Defendant Elijah at the conclusion of the retreat about his concerns. Plaintiff accused Defendant Elijah (E.D.) of abusing her powers and playing on the fact that he was formerly incarcerated, and giving him the "crumbs that falls from the master's table."

41. Plaintiff also questioned Defendant Elijah about her role in the Kayam Livingston's death. Plaintiff told Defendant Elijah that her actions were counterintuitive to the monitoring process and that she jeopardized the entire C.A. organization. In addition, plaintiff question Defendant Elijah about how could she possibly turn her back on a death that occurred within walking distance from where she lived.

42. Plaintiff informed Defendant Elijah that he had read the report that she should have submitted, and turned over to the attorney representing the family when they subpoena all documents relevant to the case. Defendant Elijah was fairly put out to learn that plaintiff was in possession of the report. She demanded to know how plaintiff was able to obtain a copy of the report and warned plaintiff that his employment would be terminated if he released it to anyone.

43. On April 1, 2015, Defendant Elijah stated twice at the staff meeting held in the conference room at the C.A. that "I don't mind breaking the law." Plaintiff was annoyed by Defendant Elijah's arrogance. Plaintiff addressed Defendant Elijah in her office after the staff meeting, and asked the defendant when was he going to give him his back pay? Defendant Elijah told plaintiff that she was going to give him the back pay, but since plaintiff had addressed the Kayam Livingston issue at the staff meeting she was not going to give him anything.

44. Defendant Elijah was angry and adamant at plaintiff. She told plaintiff that he had put her on front Street. Plaintiff tried to reason with Defendant Elijah, but all her responses felled into 1 of 3 categories: lies, damn lies, and got damn lies.

45. Some time, after the staff meeting in April 1, 2015, Defendant Elijah ordered her assistant Rita Khweye to send out an email to all the formerly incarcerated men working at the C.A. to inform them that she wanted to meet with them. The defendant summoned, Tyrrell Muhammad, Mujahid Farid, Eddie Rosario and plaintiff for a meeting in the C.A.'s conference room.

46. Defendant Elijah eventually met with plaintiff and the above mentioned formerly incarcerated men under the auspice of explaining to them how the budget works at the C.A.

47. Defendant Elijah didn't take long before revealing the real objective for the meeting. She told plaintiff and the rest of the employees present at the meeting, "if they didn't have her back against their co-workers they were "just heads in the room." Plaintiff felt humiliated and disrespected by her plot. Defendant Elijah then began to rant that if she had a girlfriend, she would not have these problems from the staff. Her homophobia fell on death ears, because none of us that she summoned to the meeting felt that was why the defendant was meeting resistance from her staff.

48. On or about June 1, 2015 plaintiff gave 3 months' notice that he was leaving the organization. Plaintiff could no longer co-exist in a workplace with Defendant Elijah (Former E.D.). Plaintiff's frustrations had nearly reached the breaking point. Out of an abundance of caution, plaintiff decided the responsible thing to do was to leave the organization and bring the matter before a court of law.

49. Ironically, after plaintiff announced his pending departure from the organization he went on two prison visits with P.V.P. to Great Meadow and to Dannemora Correctional Facilities. He was finally paid his regular wages as his co-workers performing substantially the same job. However, the damage was done and plaintiff was not in the future budget.

50. WHEREFORE, Plaintiff Russell Bowens prays for a judgment and damages in his favor against Defendant Elijah in her individual and official capacity and against the Correctional Association of New York in the amount 2,000,000 ( two million) This amount is sufficient to compensate him for years of retaliation at the C.A.N.Y. and for the loss of employment.

51. Plaintiff's case was finally dismissed without prejudice on or about August 15, 2016 without prejudice. (See exhibit: 4).

52. On August 30, 2018 Plaintiff submitted a letter to the Equal Employment Opportunity Commission asking for a Notice of Right to Sue Letter. (See exhibit: 5).

53. Plaintiff received permission to sue on December 13, 2018, and now bring this Amended Complaint and actions in a timely matter. (See exhibit: 6).

54. Plaintiff Russell Bowens declares under the penalty of perjury that the forgoing is true and correct based upon information and belief.

Dated: May 10, 2019

Respectfully submitted,

*Russell Bowens*

Russell Bowens