# Exhibits 1-6



# Correctional Association
## OF NEW YORK

2090 Adam Clayton Powell, Jr. Boulevard, Suite 200 New York, NY 10027
tel (212) 254-5700  fax (212) 473-2807  www.correctionalassociation.org

**Board of Directors**

**Chair**
Peter v.Z. Cobb

**Vice Chairs**
Gail B. Allen, M.D.
Barbara J. Berg
Ralph S. Brown, Jr.
Clay Hiles
Teresa A. Miller
Michael B. Mushlin
James D. Silbert
Gregg A. Walker
Daphnée Saget Woodley

**Treasurer**
William E. Schroeder

**Secretary**
John R. Horan

**Directors**
Bryonn Bain
Lisa H. Bebchick
Barry M. Bloom
John M. Brickman
Wilhelmus B. Bryan III
Jeffrey N. Cohen
Gregory L. Curtner
William J. Dean
Jason Feneque
Nereida L. Ferran, M.D.
Tyreta E. Foster
Leroy Frazer, Jr.
Danny Glover
Richard M. Gutierrez
Elizabeth B. Hubbard
Seymour W. James, Jr.
Ricky Jones
Sharon Katz
Thomas McKenna
Maia Rosser
Hon. Felice K. Shea
Peter Swords
David D. Troutt
Katrina vanden Heuvel
William J. vanden Heuvel
Rev. Alfonso Wyatt

**Executive Staff**

J. Soffiyah Elijah
Executive Director

Jack Beck
Director,
Prison Visiting Project

Laura A. Davidson
Director of Operations and
Human Resources

Tamar Kraft-Stolar
Director,
Women in Prison Project

Marci McLendon
Director of Development

Gordon L. Miller
Director of Finance

Gabrielle Horowitz-Prisco
Director,
Juvenile Justice Project

May 17, 2013

Soffiyah Elijah, Executive Director
The Correctional Association of New York
2090 Adam Clayton Powell, Jr. Blvd. – Suite 200
New York, New York 10027

Re: **Overview of 2012 Court Pens Visits**

Dear Soffiyah:

To recap: The CA secured a small grant from the Manhattan Borough President and with those funds hired me in January 2012 to conduct court pens monitoring. During 2012 I did conduct monitoring audits in *pre-arraignment* court pens in all five boroughs—with the exception of one "DOCS" court pen in Staten Island. Following are my findings with respect to those visits.

## QUEENS COUNTY – APRIL 17, 2012

As you may recall, our auditing team first visited the Queens County pre-arraignment pens on the morning of April 17, 2012. As usual, we were met by NYPD Assistant Commissioner Kevin Lubin, who was an important and helpful liaison throughout all our yearly visits. There were three sets of pre-arraignment pens in Queens (2 NYPD and 1 DOCS); and the DOCS pens were subdivided into different sections. Upon arrival, we were given a rather comprehensive overview of the Queens' court pens' operations by Lieutenant Costello. While his introduction may have provided the team with a helpful perspective needed to gage how to carry out our mission, I found his spiel to be long and fast, creating an "information overload"; and I wondered if it was designed for that purpose.

The general consensus of our team was that the Queens pens were well-organized in the sense of cleanliness, provision of medical services, and processing of people being detained. We were particularly impressed with the NYPD's 24-hour on-site EMS team which seemed fully prepared to address various medical contingencies.

Areas where we noted need for improvement include:

(a) Some signs were in English and Spanish; and a few throughout the facility indicated that translations were available in other languages, but these did not appear easily visible from the cells;

(b) Some signs indicated that Halal food options were available; others had the option blackout; and we did get a few complaints from people being detained regarding the quality of the food, with some even refusing to eat;

(c) The water and sandwiches provided by NYPD were kept in a milk crate, and although the sandwiches were in wrappings, the water was pre-poured into cups and sat stagnant and uncovered;

(d) We learned that the cells in the holding area are not regularly cleaned and there is no formal procedure for their cleaning. Staff informed us that they often take responsibility for cleaning and mopping the cells when the filth builds up substantially;

(e) We received reports and complaints from people that they had spent more than 24 hours confined in the pre-arraignment pens since their arrest. At least two people indicated that, upon our visit, this was their third day in the pens and they had slept either on the bench or floor during that time; DOCS does not provide sleeping mats to the male detainees; and

(f) We learned that problems exist regarding the relatively new DNA laws; i.e. detainees resisting compliance, thereby prolonging the process of their pre-arraignment.

## STATEN ISLAND (RICHMOND COUNTY – JUNE 12, 2012

*In our subsequent visits to other boroughs we found many of the problem areas mentioned in the Queens pens also exist in those court pens. They will not be repeated, but distinct problems found in subsequent boroughs audits will be highlighted.*

Upon arriving for the scheduled visit to the court pens at Staten Island on June 12, 2012, we were again met by Assistant Commissioner Kevin Lubin and other members of his team. We had been informed prior to the visit that the NYPD court pens and DOCS pens were located in separate areas of the Island. However, we had not been informed that due to that arrangement we would not be able to visit the DOCS pens, as no one from DOCS was present to meet us upon arrival. Hence, the Staten Island DOCS pre-arraignment pens escaped auditing.

We noted the strong resistance of staff to provide mats to people being detained for extensive periods. While we were told previously at the Queens facility that the objection to providing sleeping mats to males was one of security, at Staten Island the principal objection was that providing the mats was a "maintenance" issue; i.e., the burden it would entail keeping the mats clean and in sanitary condition.

We were informed that there was no on-site health or EMS for Staten Island. Staff said that medical care and screening are provided "as needed." The holding cells were divided into three sections: 2 for NYPD and 1 for DOCS. One female was in the cell in the first section, which was incredibly small and decrepit. This cell had peeling paint and dim lights. There were no bathrooms for either females or males in this section.

Staff's position was that only in "rare" cases does a detainee spend 2 to 3 days in the cells. This can happen for reasons such as further investigation, medical care, DA's office, and escapes. I question how rare the occasions really are since we found people detained during our visit who claimed to have been in pre-arraignment status for three days.

## MANHATTAN COUNTY – JUNE 26, 2012

One notable issue presented during the Manhattan auditing was the manner in which the EMS interviewing occurs. Early during the intake process, EMS staff does initial medical screening at the pre-arraignment court pens to ensure that the detainee is not in need of immediate medical attention. The process in Manhattan is very impersonal and lacking of privacy protections. The person being processed stands up a staircase approximately 15-20 feet away from the interviewing EMS person—with a table between them—as the detainee is questioned about any medical concerns.

In Manhattan we did note, that as in all the court pens, a concern regarding the tendency of some people being detained to hold back on disclosing medical issues because being referred for treatment could substantially delay their processing through the system.

A positive notation at Manhattan was a process claimed by staff whereby if a person receives a bail imposed of $3500 or less, DOCS will hold the person at 100 Centre Street for four (4) hours before transferring him/her to a county jail. If this procedure is indeed in place, perhaps it can be improved and duplicated at other boroughs.

### BRONX COUNTY – OCTOBER 9, 2012

Our audit of the Bronx Court pre-arraignment pens found no outstanding conditions or violations other than the general way in which the pens are maintained and tidied up shortly before our visits, as in all other boroughs.

### BROOKLYN (KINGS) – OCTOBER 23, 2012

By far, out of all of the county audits, we found the conditions of the Brooklyn pre-arraignment court pens to be worse than any other borough. We had received complaints from The Legal Aid Society regarding the spouse of an attorney who had been held in the Brooklyn pens for a little more than a full day. Upon our interview of the person detained, he reported: (a) No family contact allowed; (b) extremely filthy conditions; (c) no mats or blankets being provided; (d) most people being detained were there for "marijuana" possession—*no recovery*"; (e) a single telephone in the holding cell that required "quarters"; (f) being infected with bed-bugs; and (g) being only fed peanut butter & jelly sandwiches during his period of confinement. While none of the complaints he reported were surprising to us, it seems significant that this was a person without any personal prior involvement criminal justice involvement, and he was arrested and confined for a traffic infraction—so *he* was surprised and, apparently, deeply traumatized.

The findings of our visit to Brooklyn noted that, unlike other borough visits, although we received reports that Brooklyn staff cleaned the place up prior to our visit, it was still extraordinarily filthy. No smell of fresh paint, people mopping and cleaning walls, etc. One auditor noted that "dirty conditions seemed to be the norm even though with the advance notice that we were coming and the facility having so-called cleaned up prior to our arrival. Urine and feces encrusted toilet seats. Non-working water fountains." This same auditor noted having interviewed a person who complained of being in the pens for the third day without being given his regular medication. This auditor states that an EMS worker confirmed the complaint.

Additionally, we got complaints and confirmations from the people confined in the Brooklyn pens regarding the problem of widespread bed-bug infestation.

### GENERAL OBSERVATIONS

Outside of the "general living conditions" found during the course of my court pens monitoring, I believe it is imperative to offer findings on the broader issue of court pens monitoring as it is presently configured, and how this plays into the CA's broader objectives and mission.

As you know, our purview—for some time now—has been restricted to pre-arraignment pens. We do not currently monitor any other existing pens, i.e., precinct, central booking, or county pens. This, I concluded, is of serious consequence.

In organizing and performing my monitoring duties, I developed concerns as to whether anyone or agency was regularly monitoring the myriad other court pens for safe and humane conditions, and other significant issues. This concern was heightened when during one tour we were specifically excluded from viewing any of those pens, even though they were in the same building (Tombs). The supervising staff during the tour seemed to be astutely aware of a "line of division" for our oversight.

I note here that during 2012 the CA received directly reports and complaints from people alleging subjection to inhumane conditions in precinct pens, as well as complaints regarding Brooklyn's pre-arraignment pens. One such documented case involves a person who, after being stopped in his vehicle and frisked, then locked up for having a baseball bat and pocket knife found in the car, was held in a "precinct pen" for three days. It was further reported that the person took ill while in the precinct pen and had to be hospitalized for high blood pressure and diabetes problems. In any event, for most of the three-day period, this person was held in a Harlem precinct without any normal amenities provided to a person who has been processed into either the NYPD or DOCS system, or needs required by a person for basic hygiene.

And due to my own personal knowledge and experience, I had specific concerns as to whether the *county* pens where *pre-trial detainees unable to post bail* are held are being regularly monitored. My conclusion was that they are likely not. There are likely many abuses in the city's court pens escaping oversight.

<u>Government's Role</u>:

Since the court pens monitoring commenced by the CA there have been improvements in getting guidelines established for minimum conditions. While this was a giant step and commendable work, since the monitoring started and the guidelines were established there has been much slippage. In many instances, the long-fought-for guidelines are simply not enforced. As with just about any governmental agency that operates like a large bureaucracy, when the spotlight dims, so does the level of care and concern.

There should be no need to emphasize the improbability of the city implementing an effective monitoring system on its own. Since the advent of the court pens monitoring by the CA in 1989 this has been recognized as a basic contradiction.

### The Correctional Association's Role:

As you are aware, since 1989 the CA has been visiting and reporting on conditions of the court pens in New York City. The CA undertook this project as a result of recognizing that although some progress had been made bringing state prisons and county jails facilities into twentieth-century standards of decency, the court pens had been largely ignored. Some four years later the CA issued a comprehensive report outlining the conditions and problems it found, and which offered recommendations for improvement (**Crisis in the Court Pens:** *A Report of the Visiting Committee of the Correctional Association of New York, June 1993*). There has been no comparative report released by the CA since.

Though sporadic and significantly downsized, the CA has maintained the distinction of being the one agency, public or private, that tries to keep abreast of conditions in the city's court pens. My position is that court pens monitoring, as it is presently structured, could be causing detriment to the very people it is designed to protect. It could be argued that the CA, in conducting a fundamentally downsized version of oversight, is actually facilitating city officials in perpetuating an *Illusion of Serious Oversight* of overall pen conditions.

While considering the counterpoint that the CA should be concerned with the mandate it has for auditing "pre-arraignment" pens, and other pens should be the concern of those with proper jurisdiction. My response would be that there has never been a clear mandate as to which pens the CA should and could monitor. It is important to note that *Crisis in the Court Pens* included monitoring reports of not only pre-arraignment pens, but also reports of county jail pens (pages 4, 9, 17, 24). I found no documentation in the CA files on how this downsizing occurred, and my best guess is it happened by pure "slippage" due to fiscal concerns.

If monitoring pre-arraignment pens operates like a "red herring," i.e. to distract from the lack of broader oversight, then perhaps the CA should re-consider accepting such a limited mandate. The funds allotted for court pens monitoring could be otherwise well-spent.

There is another argument that at least the limited mandate keeps conditions from further deteriorating in pre-arraignment pens. I have two responses to that reasoning: (a) CA monitoring of pre-arraignment pens is sporadic with long intervals; it is well-known that NYPD and DOCS make arrangements to clean-up for our vantage; and (b) even if conditions did deteriorate to some degree by not performing those visits, the degree of slippage would not likely outweigh the harm caused by assisting the creation of illusions.

Most CA staff accompanying me on visits to audit pens took the role seriously, but I note my impression that the attitude of court pens' monitoring being a "stepchild" of the CA has permeated some. There were staff who agreed to participate who did not want to attend training sessions, and seemed to view court pens monitoring as a "scenic tour." One participating staff person failed to submit a report of their impressions and findings, even after constant prodding from me.

**RECOMMENDATIONS AND CONCLUSIONS**

My reading of the comprehensive 1993 CA report, *Crisis in the Court Pens*, suggests that it included a bit of "CA backslapping." And while the monitoring that had been conducted by the CA over the previous four years had certainly had a positive impact on improving conditions, it is my position that the use of the following type language was overstatement and unwarranted:

> "In the field of prison monitoring by citizen organizations, the CA's approach has been unique <u>in the intensity of its focus and the diversity of its effort</u>. The strategy <u>has achieved a significant degree of success which will be described in a later section of this report entitled The City's Response</u>." (emphasis supplied) and;

> "Since February 1989, the Visiting Committee has <u>conducted over 25 separate tours of the court pens in Manhattan, Brooklyn, the Bronx, and Queens.</u> These <u>regular visits have kept us fully informed of conditions in the pens</u>; have established our presence, credibility, and status as experts; and have enabled us to monitor effectively the City's progress, or lack thereof, toward making promised improvements" (emphasis supplied).

First, when one reads the referred section, The City's Response, it consists mainly of promises made by city officials, most of which never came to be. Additionally, given the volume of court pens that exist in all five boroughs, it stretches credulity to argue that "25 separate tours" over the course of four years can be classified as "intense and diverse" and allows for one to be "fully informed". And if there was intensity at some point, it has certainly fizzled over the years.

We do a serious disservice to those most directly impacted by court pens conditions when we have a propensity for ritualistic self-backslapping instead of maintaining the critical prospective of watchdog.

7

While it is important to ensure that the experiences detainees have in pre-arraignment pens are not traumatic, trauma may exacerbate in other pens without the broader focus. From my own experience and perspective, the *most* traumatic pens are the county jail pens where detainees appear for scheduled court proceedings. These can impose long-lasting trauma. It is these pens where "newly admitted" detainees, especially those unfamiliar with the system, are often subjected to robberies and abuse by those who have become hardened by experience. Moreover, it is largely these pens that compel detainees who would ordinarily opt for a trial of the charges they face, instead break down and plead guilty—a plea which many do not fully comprehend will place them in a permanent under-caste.

- There needs to be serious discussion amongst the CA, Legislative Officials, City Officials, CBO's, and the general public on how to structure and implement real and comprehensive monitoring/auditing systems for all court pens; not only city, but also statewide.

- One issue is the unwarranted use of the court pens for minor infractions. There is no sound reasoning for filling court pens with people charged with marijuana possession, even when the weed has not been recovered. Given that the CA finds that it needs to retain its court pens monitoring in some form, then it should consider re-focusing the objects of its audits. That is, in the course of pens monitoring the CA's focus would be better served if it was designed to have more of a direct impact upon mass incarceration. This could be accomplished by having the primary focus of the pens audits on whether or not the charges lodged against detainees even warrants spending what is "officially" declared as up to 24 hours of pen processing. This data could be analyzed to determine if these "pre-arraignment" court pens are being over-utilized by holding people who could have been issued desk tickets, or for other reasons should not have been confined in the pens.

My final notation here relates an applicable quotation:

> "If you stick a knife nine inches into my back and pull it out three inches; that is not progress.
> Even if you pull it all the way out, that is not progress. Progress is healing the wound, and
> America hasn't even begun to pull out the knife."
>
> *--El Hajj Malik El Shabazz (Malcolm X)*

Likewise, court pens monitoring, as it is currently configured, has not pulled the "knife" of abuses out far enough to begin the process of *healing*. I note that the 1993 report *Crisis in the Court Pens* observes that "...the court pens have been the neglected, battered child of the criminal justice system." That observation can still be made twenty years later.

In closing, I express my appreciation and thanks for all the opportunities provided to me through my work as coordinator of court pens monitoring.

Thank you for your attention and I look forward to your response.

Sincerely,


Mujahid Farid

cc: file

Log In    Sign Up



Missing Teeth?
Try This

AdChoices

**NYC** 10/23/2013 02:28 pm ET

# Kyam Livingston's Family Sues NYPD After Death In Holding Cell

By Jane Janeczko



The family of Kyam Livingston, a 37-year-old mother of two who died in police custody this past July, is suing New York City and the NYPD, The New York Daily News reports.

Livingston was arrested on July 20 at 1:51 a.m. after getting into an argument with her 79-year-old grandmother, Theresa Johnson, while drinking a bottle of vodka. Although the altercation wasn't violent, Livingston violated a specialized order of protection that her grandmother filed prohibiting alcohol or fighting in the home.

Police arrived to the residence about an hour after the fight had started to escort Livingston off the premises and arrest her. Officers transported Livingston first to Kings County Hospital to treat her apparent intoxication and eight hours later she was taken to the holding cell at Brooklyn central booking on Schermerhorn St. to await arraignment with 15 other women.

According to another inmate who was in the holding cell, Livingston complained of stomach cramps and diarrhea, but received no help or treatment from the officers who said that the woman was a drunk, the Daily News reports.

It was not until Livingston started to suffer from "apparent seizures" that officers acknowledged her complaints of ill health and called for emergency medical personnel, who arrived on the scene at 6:40 a.m.

Livingston was in the holding cell for 20 hours and, according to witnesses, was in pain for as many as seven hours before she was taken to Brooklyn Hospital where she was pronounced dead on arrival at 6:58 a.m.

On Monday, the medical examiner ruled Livingston's death to be from "natural" causes due to an alcoholic seizure resulting from chronic alcoholism.

Livingston's family wants answers. Her mother, Anita Neal, 61, wants to know the names of the officers who were working that night and she wants to see the surveillance video the holding cell.

▶ WATCH NEWS 12 NOW

Advertisement

Log In    Change Region

WEATHER    TOP STORIES    TRAFFIC    CRIME    FOOD & FUN    VIDEOS

# 22-year-old woman dies in police custody

A young woman died while in police custody in Brooklyn over the weekend.

According to authorities, 22-year-old Jasmine Lawrence, of the Bronx, was arrested Saturday for possession and sale of marijuana.

They say she was placed in a holding cell alone at the 79th Precinct at around 10 p.m. and suffered an apparent seizure two hours later.

Lawrence was rushed to Woodhull Hospital and pronounced dead. The medical examiner has not yet determined the cause of death.

HOME    WEATHER    TOP STORIES    TRAFFIC    CRIME    FOOD & FUN    VIDEOS

**FOLLOW US**
Join Us On Facebook
Join Us On Twitter
Get our Apps
Go to Mobile Website
Sign Up for Our Newsletters

**OUR NETWORK**
Optimum
Newsday
News 12 Varsity
Newsday Cars
Newsday Homes

**HELPFUL LINKS**
Careers
Internships
Advertise
RSS
About Us
News Tips
Send Us Photos/Video
Newscasts

**MORE LINKS**
Site Map
Feedback
Terms of Service
Privacy Policy

All content © 2001 - 2019 Frankly and NEWS12. All Rights Reserved. For more information on this site, please read our Privacy Policy, Terms of Service, and Ad Choices.

## Other Orders/Judgments
1:16-cv-01220-PKC-CLP Bowens v. Elijah et al

IFP,NPROSE

## U.S. District Court

## Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 7/14/2016 at 5:49 PM EDT and filed on 7/14/2016
**Case Name:** Bowens v. Elijah et al
**Case Number:** 1:16-cv-01220-PKC-CLP
**Filer:**
**Document Number:** No document attached

**Docket Text:**
**SCHEDULING ORDER: Plaintiff has failed to amend his Complaint within thirty (30) days of the Court's 6/8/16 Order Dismissing Case. Nevertheless, in light of Plaintiff's *pro se* status, the Court grants him until 8/15/16 to do so. Should Plaintiff fail to amend by the 8/15/16 deadline, this action shall be dismissed, without prejudice. Ordered by Judge Pamela K. Chen on 7/14/2016. (Levanon, Neta)**

**1:16-cv-01220-PKC-CLP Notice has been electronically mailed to:**

**1:16-cv-01220-PKC-CLP Notice will not be electronically mailed to:**

Russell Bowens
P.O Box 23515
Brooklyn, NY 11202

Russell Bowens
P.O. Box 23515
Brooklyn, New York 11202

August 30, 2018

Equal Employment Opportunity Commission (EEOC)
New York City District
33 Whitehall Street-11th Floor
New York, N.Y. 10004

RE: Notice of Right to Sue Letter

Dear EEOC,

I am respectfully submitting this Notice of Right to Sue Letter against my former employees at the Correctional Association of New York (CANY). CANY's current address is located at 22 Cortland Street 33 Fl. New York, N.Y. 10007, Phone# (212) 254-5700.

On or about April 3, 2012 I was temporarily hired by the C.A. to work in the Prison Visiting Project Department (hereinafter P.V.P.) to help with data entry. My position was supposed to last between 60 to 90 days. I was not given benefits or a salary for my temporary position. I was paid $20.00 hourly, and worked 20 hours a week. On or about July 1, 2012 my temporary status at the C.A. was extended. I received the same pay wages without benefits. On or about July 1, 2013, my temporary status was removed and I became an acknowledged employee of the C.A. All employees received a pay increase and my hourly wages increased to $20.61.

On or about September 2013, Soffiyah Elijah, Executive Director at all relevant times during these incidents, suggested to Judy Yu, Associate Director of the Lesbian, Gay, Bisexual, Transgender and Queer (hereinafter LGBTQ) Issues at the C.A., at all relevant times during these incidents, to ask me to accompany her on a series of trips to the Office of Children and Family Services (hereinafter O.C.F.S.) facilities to assist her with gathering important data concerning how well the LGBTQ's policy was being adhered to at the O.C.F.S. facilities.

Judy Yu informed me that Defendant Elijah (E.D. at the time) suggested that I accompany her on the O.C.F.S. facilities visits. She also informed me that I would have to be cleared to go into the facilities and that I would be away from home for several days. Ms. Yu informed me that I would receive a $50.00 stipend daily in lieu of my regular wages. I was fairly put out that I was asked to work longer hours, but receive significantly less pay. I found it to be preposterous and lacking twenty-first century logic.

I addressed my concerns to several of my co-workers including my immediate Supervisor Jack Beck, and the Chief Financial Officer Gordon Miller (hereinafter C.F.O.). They conceded that I should be paid my regular wages like all employees that goes on O.F.C.S. visits or any work related assignments. Upon information and belief, Gordon Miller (C.F.O.) also spoke with Laura Davidson, Director of Operations and Human Resources (hereinafter D.O.O. and H.R.) at all relevant times during this incident, about the disparity in pay that I would receive. Ms. Davidson (D.O.O. and H.R.) told Gordon Miller (C.F.O.) that it was the organization's policy to give part-time workers a $50.00 stipend for a full-day's work in lieu of their regular wages. When Gordon Miller (C.F.O.) asked Ms. Davidson (D.O.O. and H.R.) to see a copy of the policy she stated "it wasn't in writing; it's the C.A.'s practice." I found their undocumented policy to be borderline absurd. The fact that they actually enforced it crossed the border.

Leapfrogging to the issues that warrant this claim, on or about July or August, 2014, at the next staff meeting following my return from a work related trip to Baltimore, I reported back on my learnings and teachings during the conference. I keyed in on the topic of "Death of Detainees held in detention." It was a major topic at the International Red Cross Convention in Baltimore, and a topic whose time has come at the C.A. I discovered that a detainee, 37-years-old Kayam Livingston, died in the Brooklyn Court Bull Pens.

The very Bull Pens the C.A. had just monitored 7 months prior to her untimely death. I called my co-workers out on the carpet for turning a blind eye to the incident. Many of my co-workers stated that they weren't aware of the incident. I had learned that Soffiyah Elijah and the Correctional Association were covering their tracts. Ms. Elijah deliberately neglected to submit a report depicting the dehumanizing and deplorable conditions that existed in the Brooklyn Court Bull Pens prior Kayam Livingston's untimely death.

On April 1, 2015, I confronted Soffiyah Elijah for the very last time about her promise to right the wrong that her and her staff had caused me. She stated that "I was going to give you your money, but you brought the death of Kayam Livingston up at the staff meeting, and that I heard that you had been bad mouthing me." She accused me of being a whistle blower, and stated that "I expected more out of you." She then told me that "I would like for you to leave my office."

Respectfully submitted,

Russell Bowens

EEOC Form 161-B (11/16)      **U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE (ISSUED ON REQUEST)

| To: | Russell Bowens<br>Po Box 23515<br>Brooklyn, NY 11202 | From: | New York District Office<br>33 Whitehall Street<br>5th Floor<br>New York, NY 10004 |
|---|---|---|---|

[X]   *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| 520-2018-05874 | Timothy F. Coan,<br>Investigator | (212) 336-3750 |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge. It has been issued at your request. Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

[ ]   More than 180 days have passed since the filing of this charge.

[X]   Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

[X]   The EEOC is terminating its processing of this charge.

[ ]   The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge. In this regard, **the paragraph marked below applies to your case:**

[ ]   The EEOC is closing your case. Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS** of your receipt of this Notice. Otherwise, your right to sue based on the above-numbered charge will be lost.

[ ]   The EEOC is continuing its handling of your ADEA case. However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):** You already have the right to sue under the EPA (filing an EEOC charge is not required.) EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

Enclosures(s)      Kevin J. Berry,      12/13/18<br>
                                   District Director      (Date Mailed)

cc:

     CORRECTIONAL ASSOCIATION OF NY<br>
     Director of Human Resources<br>
     22 Cortland Street<br>
     33 Floor<br>
     New York, NY 10007



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5th Floor
New York, NY 10004-2112
(212) 336-3620
TTY (212) 336-3622

Mr. Russell Bowens
PO Box 23515
Brooklyn, NY 11202

Re:  EEOC Charge No. 520-2018-05874
Russell Bowens v Correctional Association of New York

Dear Mr. Bowens:

The Equal Employment Opportunity Commission (hereinafter referred to as the "Commission"), has reviewed the above-referenced charge according to our charge prioritization procedures. The procedures apply to all open charges in our inventory and call for us to focus our limited resources on those cases that are most likely to result in findings of violations of the laws we enforce.

Documentation submitted by you requesting a Notice for Right to Sue has been approved and granted by the Commission.

Attached is your Dismissal and Notice of Rights. If you want to pursue this matter further in federal court, your lawsuit must be filed within 90 days of your receipt of the Notice.

Please contact Investigator Timothy Coan at (212) 336-3750 if you have any questions.

Sincerely,

_____ for        12/13/18
Kevin J. Berry                      Date
District Director

Enc. Form 161